## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

**Fiona Schaer (nee Ginty), Andrew Schaer**

    Plaintiffs

v.	AMENDED COMPLAINT

**City of New York, City Marshal Jeffrey Rose in his individual and official capacity, John Does 1 through 8 [of whom two are John Valencia and Louis Ramirez]**

                                 Civil No. 09CIV7441

    Defendants	Jury Trial Demanded

_____

**Plaintiffs** Schaer, by and through their attorney Eugene J. Cunningham, sue defendants:

### Introduction

1.   This is an action for compensatory and punitive damages, and attorney's fees, pursuant to 42 U.S.C. §§1983 and 1988, based upon the violation of the Plaintiff's' civil rights as secured by the constitutions of the State of New York and the United States.

### JURISDICTION and VENUE

2.   This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the United States Constitution, specifically Fourth, Fifth, and Fourteenth Amendments.

3.   Jurisdiction is founded upon 28 USC §1331 and 1343, and the pendant jurisdiction of this Court to entertain claims arising under state law under 28 U.S.C. §1267 other federal statutes as they apply.

4.   Venue is invoked under 28 U.S.C. §1391, in that the Defendant New York City [hereafter "NYC"] is located within the Southern District of New York and the events complained of having occurred in this district..

### PARTIES

5. The City of New York [NYC] is a municipal corporation established under the laws of New York State.

6. Defendant *Jeffrey S. Rose* is, and was at all times herein, a City Marshal working on behalf of and under the control of the City of New York. His business address is

*5801 Avenue N,*

*Brooklyn, NY 11234.*

7. Defendant Rose is a "Marshal" of NYC, as such he has been appointed, trained, and supervised by NYC in the execution of his duties as a Marshal.

8. At all times herein, Defendant Rose, either personally or through his employees or agents who were under his control and direction, took actions complained of, under the color of law as authorized by NYC, as controlled by the official rules, procedures, regulations, laws, policy, usages and practices of NYC.

9. Defendants Doe 1 – 8 are employees of or agents of Marshal Rose, who may be one of the Does and who has identified two of them as being employees of a tow truck company he uses; they are: John Valencia and Louis Ramirez. The Does are often referred to as the Rose "team."

10. At all times hereinafter mentioned, Plaintiff Andrew Schaer and Fiona Ginty (Schaer), husband and wife, were residents of the State of New York, Saratoga County. Their residence is

*25 Lafayette St.*

*Saratoga Springs NY 12866*

**FACTS and BACKGROUND**

11. On or about May 28, 2008, at 2:30 p.m.. Plaintiff Fiona Ginty was parked, sitting in the driver's seat of the Plaintiff's car, between 76th and 77 Streets, on Columbus Avenue, NYC, New York County, New York State awaiting the return of her husband, Plaintiff Andrew Schaer who was attending a function at the New York Historical Society.

12. At approximately 2:30 p.m. an automobile pulled in behind Fiona's vehicle. She noticed a black sedan, but returned to working on her computer.

13. In a few moments, Fiona Ginty saw the man, John Doe 1, having left the sedan, was standing by her car shouting at her to get out of the car. She was immediately

fearful and pretended to ignore him. She believed the man was a thief and she did not know what to do.

14. After a few more moments, the vehicle, driven by John Doe 1, pulled up and blocked Plaintiff's car so that it could not move. The car that blocked Fiona was unmarked. John Doe 1 screamed from the car that he wanted $500 or he would seize the car. [The John Does listed in these allegation have not been identified by Defendant Rose except as to two of the Does being employees of a towing company Mr. Rose uses. They are John Valencia and Louis Ramirez. It is likely one of the Does is Mr. Rose, himself.]

15. Fiona Ginty was unable to leave the car, the door being blocked closed.

16. After half an hour, not sure what to do, she opened her window about an inch and John Doe 1 yelled "Pay me, now!" Ms. Ginty eventually understood he claimed she owed him for two parking tickets. She did not believe him and believed he was a robber. At no time did John Doe 1 identify himself.

17. Within this period, a "traffic warden," as Ms. Ginty, a native of Ireland, refers to a NYC meter attendant, walked to the black sedan and attempted to have the car leave. John Doe 1 refused and never left his sedan. The attendant said, "Don't be here when I get back."

18. John Doe 1, now, became desperate, as Ms. Ginty describes him, and he yelled he wanted $500 and would "Pull You Out!" He remained parked in traffic, blocking the egress of the car or Fiona Ginty's exit from the car, all the while shouting.

19. Ms. Ginty was upset and unable to work. She did not know what to do and looked for her husband. His cell phone was turned off. Fiona said, "Why are you keeping me hostage?" John Doe 1 replied, "I can do anything I want."

20. At this time, a second black sedan with tinted windows stopped, still closer to plaintiff's vehicle. It appeared with two tow trucks. The first sedan moved away with John Doe 1 driving. Marshal Rose may have been present.

21. Immediately, three men, John Does 2, 3, 4 alighted from the second sedan and were immediately loud and abusive. They added the yell, "Give me your keys" and pounded plaintiff's car. One of the John Doe's said, "I know your type." Still, at this point, not one of the John Does had offered any identification or explanation.

22. The traffic warden did not return, nor did any police officer intervene.

3

23. Fiona Ginty was afraid of physical attack and was frantic. She did not see her husband, had two dogs in the hot car, and was unable to leave, either by exiting her vehicle or by pulling her vehicle into traffic and driving away.

24. When Fiona Ginty finally believed John Does 2, 3, 4 were about to physically drag her from her car, she handed the keys out of the slightly open window.

25. With the engine off, the car became dangerously hot for the dogs.

26. Fiona Ginty exited the car and was not permitted to reenter by the Rose's team.

27. When one of the sedans left, John Doe 4, driver of a tow truck under the control and direction of the City Marshal Defendants, ignored instructions and allowed Fiona to enter her car and remove her work and the dogs.

28. Upon information and belief, at various times after 2:30 p.m., Rose's agents were directed by Defendant Rose.

29. At approximately 4:45 p.m., Plaintiff Andrew Schaer came upon his upset wife standing on the sidewalk with the dogs. After a moment, wherein he mistook by-standers for causing his wife's distress, he ushered Fiona and the dogs back into the car. Fiona could not speak. No one said anything to plaintiff Andrew Schaer.

30. Andrew Schaer, using his own keys, started the car, and pulled out into traffic.

31. In about a minute, Fiona Ginty said, "They are following us." Plaintiff Schaer thought she was referring to the two by-standers. He had no idea as to what had happened. Fiona was terrified and Andrew Schear confused and concerned.

32. The Plaintiffs car, at that time, was in the middle lane of rush-hour traffic, on Central Park West, when a black car with flashing lights blocked the Plaintiff's car in midstream of traffic by cutting off the Plaintiff's moving car. Andrew alleges the car was a black Crown Victoria with a "wig-wag."

33. Using a bull horn, someone in the sedan demanded plaintiffs to "Get the fuck out." Rose's team was on both sides of the Plaintiffs car, pulling on the door handles.

34. Andrew Schaer believed Roses team were police detectives.

35. When Andrew opened his window, John Doe 7 reached into the car, opened it and grabbed Andrew Schaer's arm inside plaintiffs' vehicle. The car door was then

4

unlocked and opened by the same John Doe 7 by reaching into the car, and Plaintiff Andrew Schaer was then pulled from the vehicle by force by John Doe 7. Soon thereafter, Fiona was pulled from the car by another John Doe.

36. Plaintiffs were, then, left standing in the middle of Central Park West. They negotiated traffic jam that had been created.

37. In moments, a tow truck was taking control of plaintiffs' car. Plaintiffs were ordered to get the dogs out of the car. Andrew said the attendant was hooking up the car incorrectly, but was told, "I don't give a shit."

38. As the tow truck approached Plaintiffs' car, it struck Fiona Ginty's leg. The driver told her to get out of the way.

39. Seconds later, Fiona Ginty, holding her brief case, travel bag, and the dogs, was pulled to the ground by the frantic dogs.

40. Fiona sustained a cut and contusion. Her dress was ruined.

41. Defendant Rose, it is believed, pressed the keys into Andrew's hand. Though Andrew Schaer deduced what was going on, Fiona Ginty did not. Seconds later, Plaintiffs, Fiona bruised and bleeding, were standing in traffic on Central Park West with two dogs and their belongings.

42. Within moments, Plaintiffs lost control of the two dogs who ran through traffic into Central Park, causing another person to fall. A police officer explained to the person who fell what happened and no further action followed. The officer had seen the events and did not intervene.

43. Once the dogs were recovered, Plaintiffs walked from 76 St to 42 St. (no cab would take them) in order to recover the vehicle, which is where a Doe explained it would be When they arrived at the compound, the attendant laughed and said the car would be in Brooklyn. Plaintiffs were also told to get the car as soon as possible, as Rose will want to sell it quickly, which caused the Plaintiffs to panic.

44. Plaintiffs were assisted by a police officer going off duty who walked them to a car rental office, as, he said, no hotel would take them in (as was the case with cab operators) with dogs. The officer was able to help Plaintiffs get a rental car.

45. Plaintiffs drove to Brooklyn and slept in the car with the windows open. Fiona Ginty was bitten frequently by mosquitoes. The next day, Plaintiffs were able to redeem their car and return home.

46. At 5:30 am, the next morning, Plaintiffs drove to catch a flight to Chicago where Fiona was to give a lecture. She was in physical and emotional pain.

47. After checking in at a hotel in Chicago, Andrew took Fiona to a clinic for treatment. The doctor made extensive notes and prescribed 4 drugs. Fiona was essentially poisoned. Her feet were especially painful.

48. Fiona Ginty called the GE Hotline for counseling while in Chicago.

49. For months both Plaintiffs received counseling from a local doctor.

50. Plaintiffs reported the above incidents to the NYC Marshal's oversight office on the May 30th, 2008. There was no response from New York City.

51. After a Freedom Of Information request was made, the Department of Investigations produced its findings, dated April 7, 2009, regarding this incident:

> Seizing the vehicle in those circumstances, which required the occupants to exit and remove the dogs from the vehicle in a traffic lane, violated applicable traffic rules, DOF's Standard Operating Procedures...and the Marshals Handbook...which requires them to obey the law in all official activities.

52. There was no mention of constitutional rights or violations in the finding..

53. Marshal Rose's procedures and policies were familiar to NYC; his aggressive distain for the rights of citizens being tolerated. For example:

> a. In the same finding listed above, NYC found Marshal Rose, in another case, had taken the wrong car and "...negligently filed an inaccurate report of the incident..." which included, among misrepresentations that Mr. Rose had "...incorrectly attributed the erroneous tow to his and his towing crew's having mistaken the license plane number...." (Case 081592).

> b. See *New York Times,* January 23, 2003: *Metro Matters; In Financial Crisis, Parking Fines Draw a Posse:*

...It was outstanding fines that introduced Mr. Heflin to marshals, and turned him into an outspoken reformer....they were stopped on 56th Street near Broadway when two unmarked cars and a tow truck drove up.

A scruffily dressed man (jeans, T-shirt) walked up to the window of Mr. Heflin's BMW and without saying who he was or why he was there, asked Mr. Heflin to confirm his identity. He did, the man conferred with his four colleagues, then said, "O.K., you have to pay me $636 or we tow your car."

...Skeptical..."I could only think, 'What's going on here, a scam?' " he said...He asked to talk to their supervisor. A man with a gun in his belt emerged from one of the cars and repeated the demand: pay the $636 -- in cash -- or lose the car.

Mr. Heflin...was still so skeptical that he called 911 on his cellphone...The officers confirmed the legitimacy of the marshals and advised Mr. Heflin to withdraw money from a cash machine and pay up, and he did; the supervisor still threatened towing, but one of the officers dissuaded him.

c. See *Lynn v. City of New York, et al.* 07 CIV 0392 (VM): Plaintiff was seated in a car, unidentified persons (Rose) demanded money, police called, arrested Plaintiff, charges dismissed. Case settled.

d. See attached article: *New York Magazine*, Feb. 10, 1997, p. 40: "License To Steal" with the sub-headline "Your car was parked right there, and now it's nowhere in sight. Stolen" Not exactly. Take a ride with Jeffrey Rose, New York City Marshal *professional Carjacker"* (emphasis added.)

An excerpt of note: "...When Rose and his posse descend upon a vehicle, onlookers are often confused and assume he must be with the police. That amuses him because people whose cars aren't in judgment get nervous when they see him...." p. 43

Another excerpt: " Rose himself has been sued – it's an occupational hazard – but he's had no problems with the DOI (New York City Department of Investigation)....

## CLAIMS FOR RELIEF

### 42 U.S.C. § 1983 AGAINST DEFENDANT ROSE

54. The above allegations are incorporated throughout these claims.

55. The Plaintiffs were deprived of their civil rights, see below, as expressed in the Constitution of the United States and protected by 42 U.S.C. §1983 by the actions of Marshal Rose, his employees, and agents who acted under the actual and apparent authority granted to the office of City Marshal.

56. The powers and functions bestowed upon the City Marshal's Office, and to each individual City Marshal defendants, by the City of New York, allowed those defendants to become agents and instrumentalities of NYC and, therefore, be made subject to all constitutional limitations.

57. The violative actions of Marshal Rose derived from a working policy, custom, usage and/or procedure which NYC has tolerated, ignored, and tacitly accepted.

*Count 1: Deprivation of Liberty*

58. The Defendants had no authority or permission to seize Plaintiffs, but acted under the color of law while engaged in conduct that constituted a custom, usage, practice, or procedure of NYC.

59. Plaintiffs were deprived of their liberty, their persons seized, and they were, injured physically and emotionally as a result of the actions and policy of Defendants.

*Count 2: Deprivation of the property: Loss of the use of a car*

60. Defendant Rose and his team, acting under the color of law, seized the Plaintiffs' automobile in violation of Plaintiffs' rights to be free from illegal intrusion as protected by the Constitution of the United States.

61. The illegal taking of Plaintiffs' car was the proximate cause of physical injury to Fiona Ginty and the emotional suffering and distress of both Plaintiffs.

62. Plaintiffs were required to lease another car which caused them a financial loss as a result of the seizure of their own automobile.

*Count 3: Derivative responsibility of Rose: negligent hiring or retention of employee; negligent supervision*

63. The actions of Rose's team, if not overtly or indirectly permitted or directed by Rose, were the actions of individuals with a clear disregard for the rights of citizens.

64. Rose knew, directed, or had to know how his employees acted while engaged in his sensitive business.

65. The activity of Rose's employees and agents demonstrates a lack of care in hiring, anticipating acts, training, and supervision in light of a callous disregard for citizens' rights.  As a result, Plaintiffs suffered a deprivation of their civil rights and property, as well as physical and emotional injury.

## MUNICIPAL LIABILITY -  42 U.S.C. §1983

*Count 4: NYC liable for Marshal's actions*

66. The above allegations are incorporated throughout these claims.

67. Prior to May 28, 2008, NYC developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of persons in said City, which caused the violation of plaintiffs' rights.

68. The powers and functions bestowed upon the City Marshal's Office, and to each individual City Marshal defendants, by the City of New York, allowed those defendants to become agents and instrumentalities of NYC and, therefore, be made subject to all constitutional limitations.

69. The acts of the Rose team were in essence governmental functions of  NYC.

70. It was the policy and or custom of NYC to inadequately and improperly investigate citizen complaints and to supervise the actions of the City Marshals, including the acts of defendant Rose, for at least a ten year period before this incident, and acts of misconduct were instead tolerated by NYC, including but not limited to those recounted above in paragraphs 51 – 53.  NYC failed to discourage constitutional violations by Marshal Rose, hence all marshals.

71. In the case at bar, NYC ignored the Plaintiffs allegations of abuse of civil rights and the filing of a condition precedent to this law suit. Rather, NYC fined Mr. Rose for violating procedures, such as traffic concerns.

72. There existed a tacit understanding that Rose would not be properly monitored by any supervisory authority and that constitutional misconduct would be overlooked.

73. NYC employees witnessed Rose's actions and deferred to them, demonstrating an understanding that his activities were normal procedure.

74. NYC demonstrated a deliberate indifference on the part of its policy makers and supervisors to the constitutional rights of persons within the NYC which, predictably, led to the violation of the Plaintiffs' civil rights.

75. NYC's tacit approval of Rose's policies and procedures caused the Plaintiffs' physical, emotional, financial, and due process injuries.

*Count 5: Failure to protect civil rights under the Fourth and Fourteenth Amendments to the U.S. Constitution*

76. Facts alleged above detail serious and shocking deprivations of liberty and property, under the color of law, by Marshal Rose, as supervised by NYC.

77. The intentional and trespassory acts alleged above violated Plaintiffs' guarantees of substantive and procedural due process and equal protection of the law under the U.S. Constitution.

78. NYC failed to meet its obligation to protect the Plaintiffs from the predictable violations cause by Marshal Rose and his team. This failure caused the Plaintiffs' physical, emotional, and due process injuries.

*Count 6: Deprivation of Due Process: Failure To Maintain Records and to Communicate with Plaintiff Schear; Failure to Provide Adequate Notice prior or at the time of execution; Failure to serve a valid execution document*

75. Upon information and belief, Andrew Schaer responded to mailed tickets with a plea of "not guilty" and requested a hearing by letter. Rather than respond, NYC took two default judgments which were listed among execution targets.

76. NYC provided Marshal Rose that data. Rose acted upon that data.

77. An illegible "Execution" was handed to Andrew Schaer as his car was being towed away which was the first time he was aware of the default judgments.

78. New York City is under an obligation to provide Rose with information that is not only correct, but has been created through proper due process, and to apprise Plaintiffs of events, and respond to letters. The failure to meet its due process

obligations resulted in a deprivation of the rights of Plaintiffs and to their constitutional, financial, physical and emotional injury.

*Count 7: Vicarious responsibility of New York City, et al, regarding Marshal Rose; negligent supervision and continued engagement*

79. The above paragraphs are incorporated herein by reference as in all above Counts.

80. NYC appointed Marshal Rose. He is an agent of the Defendant city. The City investigated, control, and monitors Rose.

81. According to the allegations herein, Rose was acting as the de facto arbiter of policy and/or operating under a tacit policy of NYC.

82. NYC by permitting Rose's ongoing actions is vicariously liable for Rose's violations, Plaintiffs injuries; respondeat superior protections do not exist.

## PENDANT CLAIM

*Count 8: Assault*

83. The above paragraphs are incorporated herein by reference.

84. Both Plaintiffs were placed in fear of immanent touching without consent by the intentional screaming and threatening of Rose and the Does.

85. When Andrew Schaer opened his window, the door was unlocked and pulled open. Plaintiffs were grabbed and pulled from the car. This battery evinces assault.

87. The Plaintiffs suffered emotionally as a result of the assault, as well as endured a loss of dignity, fear, and humiliation.

*Count 9: Battery*

88. The above paragraphs are incorporated herein by reference.

89. Rose's team intentionally grabbed Plaintiffs and pulled them from their car.

90. The actions were not negligent touching, rather they were intended to physically remove Plaintiffs. Rose's tow truck driver, struck Fiona Ginty, yelling for her to get out of the way so as to execute the orders and direction of Mr. Rose.

91. The Plaintiffs did not consent to this action of the John Does, who executed Defendants' policy, nor was there any authority to touch the Plaintiffs.

92. Fiona Ginty suffered physical injury and both Plaintiffs suffered emotional injury all caused by the actions of the Defendants.

*Count 10: Intentional Infliction of Emotional Distress*

93. The above paragraphs are incorporated herein by reference.

94. The actions of Rose's team, alleged above, were outrageous and extreme.

95. Those action, including screaming, pounding, imprisoning, and threats, were intended to inflict emotional distress upon the Plaintiffs so Defendants could secure the Plaintiffs' car. The actions taken on the street, with several vehicles involved, demonstrate not only an intent to inflict distress, but that Rose's team were reckless.

96. The infliction of distress, a policy and procedure of Marshal Rose, was not only intentional, but the actions of the Does made fear and distress likely.

97. Fiona Ginty was shocked and emotionally injured by the extensive abuse and hostile actions brought to bear upon her while the car was parked and, later, stopped. Andrew Schaer thought he was stopped by the police and deferred to the Does' aggressive actions - the reaction Rose's team desired.

98. For months after the events recounted above, the Plaintiffs sought psychological support. Both Plaintiffs are emotionally upset and angry to this day.

**New York State Civil Rights Law**

*Count 11: Deprivation of Civil Rights Under N.Y.'s Executive Law Article 15*

99. The above paragraphs are incorporated herein by reference as though fully set forth.

100. Executive Law §290 of New York State documents the constitutional duty of care of the state. It is submitted NYC, as a creature of New York State, must also act to

assure that every individual within its purview is afforded an equal opportunity to enjoy a full and productive life by a assuring the adequate education and training of Defendant Rose and, it is submitted, his employees.

101. NYC has not met its obligation to protect the plaintiffs' due process rights from the violation of Marshal Rose by not providing adequate instruction, control, or correction of its Marshals.

102. As a result of the failure of NYC to protect the rights of the Plaintiffs, they have been injured, as described above.

WHEREFORE, Plaintiffs demand a money judgment agaisnt all defendants, in their individual and official capacities, including punitive damages, together with attorney's fees, costs, and interest and such other and further general relief as they may be entitled. The amount of damages due Plaintiffs exceeds the jurisidictional requirments of this Court and all State and lower Courts, in addition to containing a federal question.
In addition, Plaintiff requests a declaration that it is unconstitutional to stop a vehicle, remove the occupants, and seize the car even where a legitimate default judgment may be exist; that it is unconstitutional to confine a person in a vehicle for the purpose of extracting money even where there is a legitimate judgment.

Dated: February 23, 2010    Saratoga Springs NY

EUGENE CUNNINGHAM
Attorney for Plaintiffs
28 Clinton St. No. 6
Saratoga Springs, NY 12866
Bar No.: 1470400
Telephone: 518 879 1763
email: getgene@gmail.com

To: Todd McGloughlin, Esq.
Lambert & Shackman, PLLL for Jeffrey Rose
274 Madison Ave
NY  NY   10016 – 0701

Matthew Monteverde, Esq.
Corporation Counsel of the City of New York
100 Church Street
NY  NY   10007

# LICENSE TO STEAL

YOUR CAR WAS PARKED RIGHT THERE, AND NOW IT'S NOWHERE IN SIGHT. STOLEN? NOT EXACTLY. TAKE A RIDE WITH JEFFREY ROSE, NEW YORK CITY MARSHAL AND PROFESSIONAL CARJACKER. BY JENNIFER WOLFF

THE FIRST TIME NEW YORK CITY MARSHAL JEFFREY ROSE TOWED MY CAR, I THOUGHT it had been stolen. The second time he towed it, I hoped it had been stolen. The third time, I didn't even need to call the police to know where to find it. My Honda was in a far-off corner of Brooklyn known as Red Hook, the tow-yard capital of the Western World. There have been other marshals in my life (I've been hauled five times), but in the past couple of years, Rose has followed me like a

*New York  Feb 10, 1997*

bad habit. On the nights he took my car, I'd lie awake sticking pins into my mental image of him. He was a lowly scumbag with a wet stogie drooping from his cracked lips. He wore filthy, sagging jeans and had big, oily hands strong enough to pry large cars out of tight spaces.

That was then. Tonight, Rose and I have taken to the streets, together. He doesn't at all resemble the fierce adversary I'd imagined; rather, with his disheveled mop of red hair and overgrown mustache, what he brings to mind is a Dow Scrubbing Bubble. We are in a white 1993 Ford Crown Victoria, cruising around the 13th Precinct, which encompasses Gramercy Park and part of Chelsea. Joe Garhartt, general manager of the towing service contracted by Rose, is behind the wheel, and he methodically stops at each parked car so either he or Rose can punch its license-plate number into a handheld computer programmed with this week's "hits"—cars that have accrued $230.01 or more in outstanding parking tickets and penalties, which makes them "towable" in the eyes of the Parking Violations Bureau. It matters not one little bit that the car is legally parked at the moment Rose spots it. If the owed amount is over the threshold, the car goes.

It's the first week in January, and Rose has to catch up on the money he lost during the tow-free weeks of the holidays. In seven hours, he and Garhartt haven't stopped for a cup of coffee, a sandwich, or even a pee. But it doesn't mean they don't have some fun. At times, they act like kids playing for points on a computer game, bickering over who gets to punch which plate numbers and who can punch faster. And they share the same sarcastic sympathy when one of them gets a hit. "Oh, little Cindy," Rose mutters when Cynthia Bink's silver Toyota Corolla comes up towable. I am getting what I came for: the story from the front of the tow hitch instead of behind it. And I am beginning to understand not only why marshals are so misunderstood but also why they wear guns.

No one threatens Rose tonight, but that fly-off-the-handle frisson is always in the air. After all, he is taking from people what is often their most valuable possession. And making them come to terms with parking tickets they have chosen to ignore. The moment Rose claims a scofflaw vehicle, the price to get it back soars: In addition to existing judgments, owners must pay $150 for towing, a $45 marshal's execution fee, and an additional poundage charge: 5 percent of everything,



including towing fees and unpaid tickets and penalties.

Rose will release a car on the street—and cut the towing charges in half—if the fine is paid in full and in cash. Of course, you have to spot him confiscating your car, which most people don't. Rose works fast. He can have a car seized, hitched, and towed in as little as two minutes. The longer it takes him, the greater the odds he'll come face-to-face with an angry scofflaw. "I like being a phantom, just getting the car and getting out," Rose says.

On weeknights between four and midnight, Rose and Garhartt troll the streets in the Crown Vicky, otherwise known as a "chase car." They are in constant radio contact with colleagues in another chase car, who are also punching plates. When one of them scores a hit, Rose and Garhartt get to work. Garhartt slaps a black-and-white THIS CAR HAS BEEN SEIZED sticker on the driver's-side window, circles the car, and takes pictures of it from all angles to prevent false damage claims. Meanwhile, David Terelli, the disarmingly sexy tow-truck-crew foreman, who wears a bulletproof vest beneath his green-and-yellow CITY MARSHAL STAFF windbreaker, pulls up in one of the five tow trucks Garhartt has provided for the night. With a Marlboro menthol dangling from his pouty lips, Terelli wiggles backside-down under the car and hitches it to the truck, which then hauls it to a staging area on 14th Street. From there it's moved on a flatbed truck to Red Hook. Rose, who is of average height and pudgy, usually stands back from the action filling out execution papers. If a hysterical owner appears, the hulkier Garhartt troubleshoots before getting Rose involved.

"It's a tough job collecting money; no one wants to give it to me willingly," complains Rose, 41. "I've had guys who've wanted to throw a punch, who've jumped in the car and driven into trees—terrible stuff. Not too many people look forward to seeing me."

Particularly not Judith Pinkney, a stout woman who is sitting in a white van on Third Avenue when Rose orders her to pay up or give over her friend's vehicle. "You have no right, no right at all," Pinkney screams as she gets out of the car, her arms flailing. "You can't just throw someone out of their car. It ain't legal. You're only doing this because I'm a black woman." But Rose is entirely within his rights. Marshals are permitted to confiscate any car in judgment regardless of whether the owner—or an innocent friend—happens to be sitting inside it. They don't seek out confrontation, but they won't leave a car just because someone makes a fuss.

"This job changes you, basically, personality-wise," Rose says. "I'm a gentle-type person; I'm not particularly angry or aggressive. But this is what I deal with, and you have to be a little hardened."

The mayor is allowed to appoint as many as 83 marshals to five-year terms, though right now only 49 positions are filled. As independent contractors who get paid according to their performance, marshals would seem to represent a new breed of incentive-driven public-sector henchmen. But in fact, they've been around since 1665, responsible then, as now, for executing claims from civil-court judgments. Lately, that has come to mean impounding gas and electric meters from delinquent customers, evicting deadbeat tenants, and confiscating inventory and equipment from stores and restaurants that haven't paid their vendors. And since 1987, they've been out on the streets towing cars. In fiscal year 1996, marshals confiscated 71,043 vehicles, helping the city recoup $26.4 million in parking fines and penalties. Think of them as bounty hunters empowered with a municipal badge.

At least a few marshals have been known to abuse this authority. In recent years, the Department of Investigations has arrested three marshals and several of their employees for fraud. And last December, the *Daily News* reported that the DOI was probing allegations that certain marshals were demanding kickbacks and luxury cars from towing companies that wanted the big business of impounding scofflaw vehicles. The DOI won't comment on this or any other pending investigations.

Rose himself has been sued—it's an occupational hazard—but he's had no problems with the DOI. During the day, he is usually out collecting electric meters, but at night, he tows. Rose figures he makes about $75 a car and tows an average of

25 cars an evening. His biggest catch was a stretch limo with $21,000 in outstanding tickets, which enriched him personally by about $1,100. In 1995, Rose was the second-highest earner among the nineteen marshals in the Street Seizure program, grossing some $375,000 from the Parking Violations Bureau alone.

All that money does not go directly into Rose's pocket, however. City marshals have to pay for the entire cost of their operations, including staff salaries, office rent, and insurance. They even pay the PVB $4,000 a month, which entitles them to weekly diskettes listing newly towable license-plate numbers. Yet for all this, the city provides no legal backup. A marshal is on his own if sued for towing a car that the PVB has wrongly put into judgment.

WHEN ROSE AND HIS POSSE DESCEND UPON A vehicle, onlookers are often confused and assume he must be with the police. "No one really knows what we do," Rose says. That amuses him because people whose cars aren't in judgment get nervous when they see him, like the guy in the black karate suit who frantically runs barefoot across the freezing pavement to ask Rose whether he is illegally parked. "If this isn't your car," Rose says, pointing to a red 1997 Altima, nose-up on a tow hitch, "then you're fine." Relieved, the man retreats. "I don't care if someone parks his car sideways in the middle of the street," Rose says, "as long as he doesn't owe any tickets."

Rose says he likes to tow my car because it's in good condition and has low mileage, sure signs that I'll redeem it. He hates hauling junkers that aren't worth the price of their tickets and that owners are likely to abandon. If they go unclaimed, Rose can sell them at auction after ten days. But often these cars are purchased by parts dealers for as little as $50, which goes to auction and court costs, and neither Rose nor Garhartt collects his fee.

Some cars Rose won't tow, like personal cars of police officers (which are often recognizable by an I.D. on the window or dashboard). "They'd be chasing me down all night," he explains. He also avoids vehicles with a wheelchair, crutches, or a walker in the backseat and any car with a child or an elderly person in it. This is Rose's choice, not the law. "I try to do the right thing," he says.

Not everyone does right by him. Marshals aren't supposed to take checks, but Rose has accepted them from scofflaws in a jam. He remembers one from former Yankees left fielder Roy White, an all-star from back in the seventies and one of Rose's sports heroes. "He told me he was good for it, and there was no reason not to believe him," Rose says. "That one really hurt, boy, I'll tell ya." The ballplayer did eventually pay his fine in full, but Rose won't make the same mistake again. These days, he carries copies of bounced checks on his towing rounds, to remind him not to go soft.

And people try to trick him. "There was this big, 500-pound fatty who says, 'Do me a favor; I have a receipt in my glove compartment—just look it over.'" Rose recalls. "I got the tow truck in front of him and my car alongside of him, and we're on a very narrow curb, and because I can't envision him going anywhere, I say, 'No problem.' He gets into the car, locks the doors, takes a deep breath, turns on the engine, runs into my tow guy and proceeds to drive two blocks on the sidewalk with my guy on his hood. People just lose it."

"Yeah," I tell him. "I know."

THE WORST PART OF BEING TOWED BY JEFFREY ROSE IS FACING his staff the next day in his grubby little office in downtown Brooklyn. This is where scofflaws must go to pay their fines and penalties before trekking out to Red Hook to retrieve their cars. Rose has a handful of employees who process the paperwork, some of whom used to work at the PVB. As former civil servants, they seem to believe that by screaming at you rather than ignoring you they are somehow doing you a favor. They sit protected behind a heavy locked door, visible only through a small Lucite cashier's window, and they never rush, not for anything. The fist and shoe marks on the office walls are a tribute to the deep passion these women— and the man they work for—evoke from agitated car owners. So are certain eloquent scribblings: JEFFREY ROSE: I HOPE YOUR FAMILY WILL GET CANCER. Or, more to the point: JEFFREY ROSE SUCKS DICK.

Rose explains that he also gets frustrated by his attitudinal staff—that they are not a reflection of the mensch he believes himself to be. After spending some time with him, I might agree, although I try hard to resist the notion that this man has any redeeming qualities.

But he's trying. When I met with him in his office, he noticed I had the sniffles. "Have some tissues," he said.

"I paid for those tissues!" I tell him, trying to get in a dig.

He blushes and says, softly, "Here, let me bring them closer to you."

On our tow-date a couple of weeks later, he hands me a brown velvet glove I have unknowingly dropped on the street. "I wouldn't want you to lose this," Rose tells me. "I know how hard it would be to match the color."

So why is a man like this out there at night, making people like me miserable? Is it some kind of power trip? "I ac-



tually feel bad towing someone's car, which is why I am genuinely glad when no one is around," Rose says. "For me, the sound of the computer telling me it's a hit is more thrilling than actually taking the car. It's like you hit the slot machine."

Quite simply, Rose loves what he does, even if it means he leaves too early to kiss his wife good morning on the days he impounds electric meters, and comes home too late from towing to put his 2-year-old son to bed. "The bottom line is that if you have the opportunity to make money and that opportunity is only at night, you can sit in the house and play with the baby, or you can tow cars."

It's almost midnight, and I'm freezing and seriously carsick. I say good night to Rose a little earlier than I had expected to. Tonight he's hit the jackpot 30 times, about 5 more cars than average but still way short of the 42 he towed the night before. "You're bringing me bad luck," he tells me throughout the evening, but never with anger. When I get home, I notice a parking ticket on my dresser. For once, I think about paying it. Then I remember Rose's last words to me before I left: "You have one get-out-of-jail-free card. With me, you are safe."

One city marshal down, eighteen to go. ■

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**Fiona Schaer (nee Ginty), Andrew Schaer**
    Plaintiffs

v.

Affidavit of Service
Amended Complaint

**City of New York, Cit Marshal Jeffrey Rose**
**Et al**
    Defendants

---

STATE OF NEW YORK
COUNTY OF SARATOGA

I, Eugene Cunningham, attorney for Plaintiffs, served a copy of the attached Amended Complaint upon all other parties in this action by mailing the Amended Complaint to

1. Todd McGloughlin, Attorney for Marshal Jeffrey Rose at
   Lambert & Shackman PLLL
   274 Madison Avenue
   NY, NY 10016-0701

2. Matthew Monteverde, Attorney for New York City,
   Corporation Counsel of the City of New York
   100 Church St.
   NY, NY 10007

on February 3, 2010, by placing the respective envelopes in a U.S. Mailbox at 28 Clinton St. Saratoga Springs, NY 12866

_Eugene Cunningham_

Sworn to before me this
17th day Feb. of 2010

_Notary Public_

**BARBARA L SIMON**
Notary Public - State of New York
No. 01SI6159981
Qualified in Saratoga County
My Commission Expires Jan. 29, 2011